UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAM PHAN NGUYEN,<br><br>                 Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>                 Defendant. | Case No.: 3:17-cv-1406-MMA-NLS<br><br>**REPORT AND<br>RECOMMENDATION FOR ORDER:**<br><br>**(1) GRANTING IN PART<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT [ECF No.<br>13]; and**<br><br>**(2) DENYING DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT [ECF No. 14]** |

     Mr. Nguyen[1] ("Plaintiff") brings this action under the Social Security Act. *See* 42 U.S.C. § 405(g). Plaintiff seeks judicial review of the Social Security Administration's ("Defendant") final decision denying his claim for Disability Insurance Benefits and Supplemental Security Income benefits. This case was referred for a report and

---

[1] In Plaintiff's initial complaint, Mr. Nguyen is named in the caption as "Tam Phan Nguyen." ECF No. 1. In the motion for summary judgment and throughout the submissions to the Social Security Administration, Mr. Nguyen's name is listed "Phan Tam Nguyen." *See* ECF Nos. 11, 13-1.

recommendation on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636(b)(1)(B).

## I.    INTRODUCTION

Plaintiff challenges the Administrative Law Judge's ("ALJ") findings regarding both Plaintiff's physical and mental impairments. ECF No. 13 at 1. As to Plaintiff's physical impairments, there was conflicting evidence in the medical record regarding Plaintiff's vision loss and hand tremors, and the Court finds that the ALJ did not err in resolving inconsistencies.

As to Plaintiff's mental impairments, the Court agrees with Plaintiff that he consistently exhibited symptoms of severe mental illness since at least 2011, which were improperly discounted by the ALJ when he rejected all treating physician's opinions regarding mental illness, and accepted only the opinion of the State reviewing physician, Dr. Koretzky. ECF No. 13-1 at 8-12; Administrative Record ("AR") 110-11. The ALJ also failed to make clear the basis for his credibility determinations, or that they were consistent with and/or supported by the record as a whole.

After careful consideration of the papers submitted, the administrative record, the ALJ's decision, and the applicable law, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED IN PART** and **REMANDED** for further consideration; and that Defendant's cross motion for summary judgment be **DENIED**.

## II.    BACKGROUND

### A. Procedural History

Plaintiff initially applied for disability insurance benefits under Title II and supplemental social security income under Title XVI on October 11, 2013. AR 182-92. Both applications alleged a disability onset date of June 1, 2011. AR 182, 184.

The Social Security Administration denied Plaintiff's applications initially and on reconsideration. *See* AR 53, 62, 79, 94. At Plaintiff's request, an ALJ, Jay Levine, held a hearing on January 4, 2016. AR 14-43, 134-35. The ALJ issued his decision on April 1, 2016, finding Plaintiff is not disabled within the meaning of the Social Security Act.

AR 96-113.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on May 12, 2017, causing the decision to become final.  AR 1-6.

Plaintiff timely filed his complaint for judicial review on July 12, 2017.  He asks the Court to reverse the ALJ's decision and award benefits.  ECF No. 1.

## B. Plaintiff's Background

Plaintiff was born on May 10, 1972 in South Vietnam.  AR 420.  He attended school until the sixth grade while in Vietnam.  AR 202.  Plaintiff immigrated to the United States with his family in 1993 at the age of 21.  AR 19, 420.  Plaintiff is able to speak and understand some English, but is best aided by an interpreter.  *Compare* AR 19-20 *with* AR 200.

From 1993 to 2006, Plaintiff worked as a furniture mover/assemblyman.  AR 202.  Due to a back/neck injury, he changed careers.  AR 22, 202.  Plaintiff worked as a manicurist in a nail salon from 2007 until 2011.  AR 202.  Plaintiff alleges a disability onset date of June 1, 2011.  AR 184.

## C. Documentary Medical Evidence

### 1. <u>Treating Physicians</u>

#### a) *Dr. Ton D. Tran, M.D.*

Dr. Tran treated Plaintiff between June 2011 and December 2011.  AR 310-14.  Dr. Tran noted Plaintiff's hypothyroidism in each visit's notes, and noticed tremors on three occasions, which improved with medication.  AR 312-14, 330.  Dr. Tran found that Plaintiff's complaints affected his activities of daily living, such as working.  AR 338.  When Plaintiff complained of "blurry vision, pressure, irritation, [and] feels inflammation ... can't close eyes completely while sleeping," Dr. Tran referred Plaintiff to the Shiley Eye Center for follow up with Dr. Kikkawa.  AR 338.

#### b) *Dr. Don O. Kikkawa, M.D.*

Dr. Kikkawa conducted an ophthalmic consult first in November 2011, and continued treatment through October 2015.  AR 338, 348-49, 351-53, 671-75.  During appointments through 2013, Plaintiff had no complaints, stating "eyes are ok." AR 349,

351, 353.  Dr. Kikkawa noted Plaintiff's thyroid disease and that Plaintiff had a "history of bulging in both eyes associated with an enlarged thyroid gland."  AR 354.

Beginning in April 2014 and at the following appointments, Plaintiff complained that he had eye pain, blurry vision, and "can't see too good."  AR 673-75.  At these appointments, Dr. Kikkawa repeatedly noted Plaintiff's hyperthyroid, Graves' disease, and diplopia.  AR 671-75.  At both the August 2014 and October 2015 appointments, Dr. Kikkawa reported Plaintiff's eye symptoms were stable.  AR 671, 674.

### c) *Dr. Diana L. Marquardt, M.D.*

Medical records indicate Dr. Marquardt was Plaintiff's primary care physician from December 2011 through January 2014, sometimes seeing Plaintiff monthly.  At each and every visit, Plaintiff was assessed as "Oriented x 3."[2]

On December 5, 2011, Dr. Marquardt saw Plaintiff as a new patient, for a thyroid check-up.  AR 401.  She noted that he had been on medication for hyperthyroidism for eight months, and had been to the ER recently with eye problems.  AR 401.  During her general examination, she noticed "no tremor." AR 401.  Also, at this appointment, Dr. Marquardt listed thyrotoxicosis as the only diagnosis.  AR 401.

Dr. Marquardt later saw Plaintiff for a thyroid follow up appointment.  AR 399.  Plaintiff told Dr. Marquardt that his current prescription was making his eyes dry, however, Dr. Marquardt was skeptical.  AR 399.  She noted that Plaintiff "wants to be seen for this as [he] is very concerned," and so put in a referral to Ophthalmology, to see if it was "truly opthalmopathy instead of just dry eyes."  AR 400.

---

[2] When a physician notes that a patient is "oriented x 3," that patient is "awake and responsive, and oriented to person, place, and time."  Ester Heerema, *What Does Oriented x1, x2, x3 and x4 Mean in Dementia?*, VERYWELLHEALTH (Oct. 18, 2017), https://www.verywellhealth.com/what-is-orientation-and-how-is-it-affected-by-dementia-98571.  "Oriented x 4" includes an additional element of knowledge of event, which means that the patient is aware of what just happened or why he is at the doctor's office. *Id.*  This fourth level of awareness was missing in every one of Dr. Marquardt's progress notes, as she only refers to Plaintiff as "Oriented x 3."  *See, e.g.*, AR 389, 391, 393, 395, 397, 399, 401, 412, 415.

Beginning on June 1, 2012, Dr. Marquardt noted Plaintiff was "having angry episodes, hearing voices, not sleeping well, making a lot of noise. Not really new, but has not seen psychiatry for this and it is becoming worse." AR 395. Dr. Marquardt was concerned with Plaintiff's paranoia/psychosis, and sought an "e-consult to psychiatry for LIHP to get approval so we can then find someone to see him" based on her assessment of "worsening psychotic symptoms over the last few years." AR 396, 475. She noted in her e-consult request that Plaintiff had "worsening mood swings, outbursts of anger, hearing voices" that preceded the thyroid disease. AR 475. At an appointment on June 29, 2012, Dr. Marquardt noted that Plaintiff "has had psychotic behavior including hearing voices and rage problems and very poor sleep." AR 393. Dr. Marquardt modified his medication in response to these symptoms. AR 393.

At the next appointment, July 27, 2012, Dr. Marquardt's notes find Plaintiff "bipolar [with] psychotic features," and that he had "severe mental health problems," that numerous medications failed to fix.[3] AR 329. She also noted Plaintiff's tremor from his thyroid condition. AR 329. Plaintiff "stopped [taking prescription] because of tired legs after only 8 days. Might have been helping with issues of psychosis and bipolar disorder." AR 391. She concluded that "basically patient does not really want to take meds, and family has had problems with all of this over the years. … The more we talk, the more it is clear that he has had severe psychotic and bipolar problems that have disrupted his life for more than 10 years." AR 391. Similar notes were made during an October 5, 2012 appointment, that Plaintiff's bipolar disorder was a "major issue for patient and family" and that Plaintiff complains of "side effects from many antipsychotic meds, and not clear if these are real or patient's way of not taking them. Needs psychiatry." AR 389.

---

[3] At this appointment, for the medical billing code Dr. Marquardt chose as the primary diagnosis was listed as 296.64 (bipolar disorder with psychotic features) and the secondary diagnosis was listed as 242.90 (thyrotoxicosis, hypothyroidism). AR 329.

3:17-cv-1406-MMA-NLS

In the fall of 2012, Dr. Marquardt referred Plaintiff to Dr. Argoud in Endocrinology, since Plaintiff "has been on tapazole and other thyroid suppression for almost a year and a half and would like to get radioactive iodine treatment if appropriate." AR 390. She also noted that the Low Income Health Program ("LIHP") was reinstated, "so can make psychiatry appointment which is critical" given his problems tolerating the recommended medication. AR 387. Dr. Marquardt wanted to "try to schedule with psych asap." AR 387-88.

On January 4, 2013, Dr. Marquardt saw Plaintiff for a follow up appointment. AR 381. Dr. Marquardt noted that Plaintiff was seeing psychiatrist (Dr. Carlton), and that he wanted to keep seeing her. AR 381. Plaintiff indicted he was not taking the full prescription for treating Bipolar disorder because it made him weak. AR 381. Dr. Marquardt also noted that Plaintiff was seen by Dr. Argoud in October 2012, where he elected for radioactive iodine ("RAI") treatment instead of surgery for his goiter and exophthalmos. AR 381.

From October 2013 to January 2014, Dr. Marquardt continued to see Plaintiff, for hyperthyroidism and Bipolar disorder, noting on multiple occasions that the Plaintiff's "affect [is] odd." AR 412, 414. She otherwise continued to treat Plaintiff, with referrals to an endocrinologist for further treatment and radioactive iodine on several occasions. AR 412-15, 432.

### d) *Maria A. Argoud, PA-C and Dr. Georges Argoud, M.D.*

Plaintiff was referred to thyroid specialists at the San Diego Coastal Endocrinology Group[4] by Dr. Marquardt. AR 363, 374. From 2012 to 2013, Ms. Argoud consistently noted Plaintiff's blurry vision, Graves' disease, hypothyroidism, and medications. AR 360-64. On April 18, 2013, she also noted that Plaintiff had tremors and palpitations, but that she was unsure if he truly needed a neural scan. AR 362.

---

[4] Plaintiff was seen primarily by Ms. Argoud (a physician's assistant), but Dr. Argoud was "involved with the patient's evaluation, diagnosis, and treatment." AR 360-64.

At an October 23, 2012 appointment, Ms. Argoud noted that Plaintiff "denies any chest pain, palpitations, blurred or double vision, weight loss, anxiety, tremors, or fevers" and appeared "without depressed affect or significant anxiety." AR 363. At that consultation, she also noted that Plaintiff had "no change in vision" and "no extremity weakness, tremor, or ataxia." AR 363. She concluded that Plaintiff had Graves' disease. AR 363. She stated that she "discussed with patient that we recommend surgery due to his exophthalmos and large goiter. He declines and prefers to do radioactive iodine therapy. Discussed that radioactive iodine therapy may cause an increase in proptosis [eye bulging]." AR 364. She suggested referring Plaintiff back to the ophthalmologist to follow up, because of the increased proptosis expected. AR 364.

On March 21, 2014, Ms. Argoud saw Plaintiff for a follow up regarding Graves' disease. AR 465. She found a goiter on his neck during the physical examination, but other systems were normal; Plaintiff had "no tremor." AR 465. She concluded that "if hyperthyroidism returns, RAI [treatment] vs surgery is indicated." AR 466.

### e) Dr. Sharmila Carlton, M.D.

On November 14, 2012, December 6, 2012, and January 9, 2013, Dr. Carlton had psychiatric consultations with Plaintiff at Dr. Marquardt's referral. AR 379, 383, 386. Plaintiff stated that "he feels paranoid about people running him over, but denies specific delusion." AR 379, 383, 386. Plaintiff denied any past or present visual hallucinations. AR 379, 383, 386. Dr. Carlton noted that "manic [symptom] is [auditory hallucination] of many voices, male and female, conversing with themselves and him." AR 379, 383, 386. Plaintiff denied that the voices ever made commands. AR 379, 383, 386. During the December 2012 appointment, Dr. Carlton stated that Plaintiff denied visual hallucinations or delusions, but "during interview told us that he heard something outside, and feared going out [because] he was afraid they would stab him." AR 384. At the end of each set of progress notes, Dr. Carlton notes that Plaintiff needed to bring a family member with him to the next appointment because he was a "poor historian" and "[she] need[ed] corroborative evidence." AR 379-80, 383-86.

### f) Andrea Karp, Psy.D.

On January 29, 2013, Dr. Karp had a psychiatric consultation with Plaintiff. AR 376. Though she stated that "patient was oriented to time, place," she also noted Plaintiff had auditory hallucinations. AR 376. She stated that he had "paranoid ideation" and that he denied any visual hallucinations. AR 376. He sometimes had auditory hallucinations. AR 376. As far as daily functioning, he "lives independently." AR 376. She also noted that he stopped working "due to blurry vision caused by Thyroid problem." AR 377. Plaintiff's paranoia began around the same time his father had a stroke (two years prior to consultation). AR 377. Dr. Karp assessed that Plaintiff had psychosis, a general diagnosis because it was "difficult to ascertain [symptoms] as [patient] is poor historian – need to have family input." AR 378.

### g) Dr. Harry C. Henderson, III, M.D.

Dr. Henderson saw Plaintiff for a psychiatric consult on April 5, 2014, with regular follow ups until December 20, 2015. AR 663. Dr. Henderson's clinical notes are not part of the record,[5] however, two prepared reports, dated 2015 and 2016, summarize his findings and conclusions.

In a report dated December 22, 2015, Dr. Henderson explained he started seeing Plaintiff in 2014. At Dr. Henderson's initial evaluation, Plaintiff "reported that someone is following him," and presented symptoms of paranoia and depression. AR 663. Throughout treatment, Plaintiff reported "visual and auditory hallucinations." AR 663. Dr. Henderson observed Plaintiff's "memory and concentration are both decreased secondary to his mental illness. He is not able to stay focused and concentrate for any length of time." AR 663. "In addition to his severe mental illness, [Plaintiff] is suffering from hyperthyroidism, tremor in both hands, and impaired vision." AR 664. As to future

---

[5] Though, they are referenced in other parts of the record: in Dr. Koretzky's report (which was given partial weight by the ALJ), commented that Dr. Henderson's handwritten notes from April 15, 2014 "were hard to decipher." AR 87-88.

employment, Dr. Henderson stated that because of his "intense emotional state[,]" Plaintiff cannot hold down a job: "he cannot focus and cannot keep a schedule due to the severity of his mental illness." AR 664. Though Plaintiff has been treated with various medications, Plaintiff "remains depressed with feelings of paranoia and severe panic episodes." AR 664.

Dr. Henderson reported a bleak outlook for Plaintiff's future work ability and opportunities: Plaintiff's "ability to perform work-related activities on a day to day basis in a regular work setting is seriously restricted. … His ability to remember, understand and carry our short and simple instructions is seriously limited." AR 664. Dr. Henderson reported that Plaintiff "would not be able to compete in the workplace" because he has a "marked inability to perform even simple repetitive tasks." AR 665. Plaintiff's "ability to perform within a schedule and maintain regular attendance at work, is severely restricted." AR 665. Additionally, Plaintiff "has a poor ability to maintain a normal workday due to his severe depression, feelings of panic and anxiousness and paranoia." AR 665. Dr. Henderson concluded that, even after continued treatment, Plaintiff "is permanently disabled and unable to work." AR 665.

The second report is dated March 17, 2016, responding to the ALJ's request for a psychiatric report. AR 690.[6] There, Dr. Henderson largely reiterated his 2015 report. He stated that Plaintiff's mental illness began in or about 2012 to 2013, culminating in "severe mental episodes," with the "police being called to the house multiple times because of his explosive temper." AR 690. Dr. Henderson described Plaintiff as a "burden to his mother, who is also caring for a disabled husband."[7] AR 690. Plaintiff

---

[6] Defendant argues this report was not available to the ALJ (ECF No. 15 at 10); however it appears it was drafted in response to a direct request from the ALJ. AR 690.

[7] Throughout the administrative record, Plaintiff indicated that he was taking care of his mother and father. However, Dr. Henderson reported that Plaintiff "is in severe delusion thinking that he is caring for his ill father but actually he is a burden to the family who has been supervising him." AR 690. Also, in contradiction to Plaintiff's deluded statements throughout the administrative record, Dr. Henderson

9

has "been in continuous pain and discomfort" and hears "screaming in his ears" at night. AR 690. Plaintiff experiences a chronic tremor, headaches, dizziness, hallucinations, delusion, and is "unable to focus on day-to-day responsibility." AR 691. Plaintiff's short term memory "appeared diminished," his judgment "appeared comprised" by his mental state, and his "[a]ttention and concentration span were only fair." AR 691. Though Plaintiff showed no signs of overt hallucinations or delusional phenomena during examination, Dr. Henderson noted "a paranoid quality in his speech," that he opined could be drawn from the "noises in his ears" or Plaintiff's belief that people are chasing him. AR 691. Dr. Henderson evaluated Plaintiff's diagnosis as "Extreme." AR 691. He evaluated Plaintiff's ability to follow work rules as "poor," and his ability to use adequate judgment as "fair to poor." AR 692. Dr. Henderson also concluded that Plaintiff "is not competent to handle his own funds if granted disability." AR 692.

### h) Dr. Don Edward Miller, Ph.D.

Dr. Miller is a psychologist, who was asked by Dr. Henderson to examine Plaintiff and perform psychological tests. AR 418-19. On July 31, 2014, Dr. Miller conducted a three-hour clinical interview and administered a partial Wechsler Adult Intelligence Scale – III ("WAIS III"). AR 419. During the mental status examination, Plaintiff was able to recite his phone number without looking at anything, but was "unable to remember his correct address," even though he said he had lived there for five years. AR 419. Dr. Miller stated that Plaintiff was "at least partially oriented to time and place and person." AR 419. Dr. Miller was aware of Plaintiff's work history, thyroid condition, and double vision. Plaintiff admitted that "medicine helped" with double vision. AR 421. Plaintiff spends most of his day watching videos on the computer, though he "can't read things on the computer … he can make out movies enough to make it worth his while." AR 421. Plaintiff stated that "on and off since 2007, after his condition improved a bit, he did try

_____

stated that Plaintiff's "day-to-day activities consist of very little. He does not cook or shop. He does not drive. ... and does not do any of the household activities such as cleaning, laundry or dishes." AR 692.

to apply for work now and then but since 2011 he has not attempted to apply for work [because] 'I couldn't handle it.'"  AR 421.

Dr. Miller noted that Plaintiff's "deficiencies in cognitive abilities are striking, particularly his short term memory problems."  AR 420.  During the examination, Plaintiff "could not comprehend and follow instructions, nor could he work at simple and repetitive tasks" and "has a complete inability to perform complex and varied tasks."  AR 425.  Utilizing the scores from the partial WAIS III test, Dr. Miller extrapolated the data to estimate Plaintiff's I.Q. at 65, which "used to be referred to as the mildly retarded range" but is "now referred to as an extremely low intellectual level [meaning] he is exhibiting a severe cognitive deficit."  AR 420.

Dr. Miller relied on research from Wikipedia to support his opinion that Plaintiff's I.Q./cognitive function may also have been affected either by hyperthyroidism, or from the anxiety and depression surrounding it.  AR 422-23.  He thought Plaintiff's condition/symptoms were consistent with mild brain damage, "particularly in forgetting events so quickly" and because the "information [Plaintiff] does remember, does not get transferred to his long-term memory."  AR 425.  Further, Dr. Miller noted that Plaintiff "could not maintain an appropriate work pace [since] he is easily fatigued and has low energy[.]"  AR 425.  Dr. Miller limits the Plaintiff to "simple chores" because "he cannot make generalizations, evaluations or decisions on any new areas with or without immediate supervision[.]"  AR 425.

Following his examination, Dr. Miller diagnosed Plaintiff with (1) recurrent, severe, major depressive disorder; (2) generalized anxiety disorder; and (3) amnestic disorder.  AR 423.  He found Plaintiff "has anxiety, palpitations, strange sensations in his body and apparent panic like states.  He is easily fatigued.  He has problems concentrating, his mind goes blank."  AR 423.  Based on his examination and observations, Dr. Miller concluded that "it appears unlikely, due to the regressed state of this patient, that there will be any time in the future that he will be able to return to work,

even a sedentary job with low stress, due to his concentration problems, his anxiety and his short term memory problems…." AR 422; *see also* AR 425.

### i) *Dr. Milton Lessner, Ph.D.*

Dr. Henderson also referred Plaintiff to Dr. Lessner for a psychological evaluation. Dr. Lessner assessed Plaintiff on April 2, 2015, noting Plaintiff seemed "schizoid and isolate." AR 478. Issues with short-term memory were apparent by use of frequent calls to his mother to gain information; Plaintiff's "memory was seriously lacking on matters of time, places, and feelings." AR 478-79.

Dr. Lessner conducted several diagnostic tests including: (1) the Mooney Problem Checklist; (2) Rotter Incomplete Sentence Blank; (3) Bender Gastalt Test; (4) Beck Depression Inventory; and (5) Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). AR 483.

Much of the report focuses on the MMPI-2 responses. Plaintiff's "three coded configuration (8-6-7) (MMPI-2) has been referred to as the 'psychotic valley' since it discloses considerable psychotic behavior" such as hallucinations, delusions, and persecutions. AR 485. On one side of the pendulum, Plaintiff has problems with anger management: "[h]e has a quick temper and may go into a rage when provoked." AR 479. On the other hand, Plaintiff "has fits of laughing and crying which he is unable to control." AR 486. He is "often confused" and "disoriented." AR 485. Plaintiff stated that "evil spirits possess him" and "his soul leaves his body[,]" and he believes "someone is trying to influence his mind." AR 485. Plaintiff feels, at times, like he is being followed. AR 484. Plaintiff also feels that "someone is making him do things by hypnotizing him." AR 486. Plaintiff "has seen a vision" and "is convinced he can read people's minds." AR 486. When Plaintiff is "with people, he is bothered by hearing strange things." AR 484, 486. Sometimes, Plaintiff "hears his thoughts being spoken out loud." AR 486.

Plaintiff's responses to the Rotter Incomplete Sentence Blank revealed "anger management problems" and suicidal ideation.  AR 487.  In response to the Mooney Problem Checklist he reported "sometimes feeling things are not real."  AR 487.

Plaintiff's reproductions as part of the Bender Gestalt Test indicated emotional instability, anxiety, depression, hostility, rage, psychosis, paranoia, and possible brain damage.  AR 487-88.  Dr. Lessner conducted the Beck Depression Inventory "not so much for diagnosis but purportedly to determine the severity of his depression."  AR 488.  Dr. Lessner found that Plaintiff "hates himself," "has lost all interests in human associations," and "cannot make decisions at all anymore."  AR 488.

Dr. Lessner reported that his diagnostic impression of Plaintiff included major depression with psychotic features; generalized anxiety disorder; post-traumatic stress disorder; Schizoid Personality Disorder; social, physical, psychotic and emotional disorders; and a GAF score of 30.  AR 488-89.  In Dr. Lessner's opinion, Plaintiff's "disabilities go beyond physical injuries and potentially include mental and characterological disorders."  AR 483.  Dr. Lessner reiterated Dr. Miller's reporting that in "no time in the future will [Plaintiff] be able to return to work due to concentration problems, short term memory, and suspected brain damage."  AR 483.  He also stated that "prognosis of [Plaintiff's] debilities tend to be rather futile" and "[i]n the opinion of most of his examining physicians they acknowledge his state of disability and contend that under no circumstances could he tolerate any employment."  AR 483.

### j)  Dr. James S. Grisola, M.D.

Records indicate Plaintiff saw Dr. Grisolia twice at his Adult and Child Neurology facility.  At the first appointment on August 5, 2014, Dr. Grisolia noted "bilateral visual blurring due to residual optic nerve damage" due to Plaintiff's thyroid eye disease and found that "this is a permanent deficit resulting in a low vision state" and "sustained use of his eyes will result in double vision."  AR 429.  Dr. Grisolia's exam notes contain some contradictions:  "visual fields full … visual acuity is 20/70 bilaterally" and that Plaintiff had fluent speech, "comprehension and language intact, general knowledge and

judgment within normal variation, recalled 3/3 objects immediately and after 5 minutes, remote memory intact, atten[tion]/concentration intact." AR 430.  He stated that Plaintiff did not have any obvious double vision and no tremors or ataxia.  AR 430.

On November 24, 2015, Dr. Grisolia saw Plaintiff for a follow up.  AR 490. Again, Dr. Grisolia found low vision in both eyes, and also noted that Dr. Lessner's report was supported.  AR 490.  He reported that Plaintiff was "alert and oriented x 3," displayed no tremors, but showed a "definitely odd affect."  AR 491.

### k) Dr. Margot J. Aiken, M.D., F.R.C.P., F.A.C.E.

Plaintiff was referred to Dr. Aiken, who saw Plaintiff for the first time on May 4, 2015.  AR 516, 535.  She reported that Plaintiff had blurred vision, tremulousness, anxiety, occasional numbness in his arms, and severe numbness in his legs and feet.  AR 516.  When she examined him, she noted "tremor of the outstretched hands," but otherwise reported a "normal affect."  AR 517.  Plaintiff's symptoms led Dr. Aiken to believe he "is currently hyperthyroid," hence she advised him to increase his medication dosage until they conducted more laboratory tests and ultrasounds to determine whether to proceed with medication and/or either radioactive iodine ablation or surgery.  AR 517. On May 22, 2015, Dr. Aiken saw Plaintiff for a follow up appointment, where she performed imaging for his hypothyroidism.[8]  AR 518, 520.  Plaintiff complained of palpitations at night and was upset about his thyroid enlargement.  AR 518.  Dr. Aiken discussed the risks of thyroidectomy surgery and radioactive iodine ablation ("which is preferred treatment for the patient"), but "he still wishes to proceed with surgery."  AR 519.  At the next appointment on August 26, 2015, despite complaints of breathing difficulty, double vision, and visual blurring, Dr. Aiken's examination found no lid retraction and that Plaintiff was a "well appearing male in no acute distress."  AR 534.

---

[8] Interestingly, during her May 4, 2015 and May 22, 2015 appointments, Dr. Aiken listed the Plaintiff as having "never smoked," which contradicts the rest of the administrative record. AR 518, 521.

*l)*  ***Dr. Jeffrey A. Sandler, M.D., F.A.C.E.[9]***

Medical records indicate that Dr. Sandler saw Plaintiff during the second half of 2015 to treat his hyperthyroid.  AR 529-532.  In October 2015, Plaintiff complained of fatigue in his eyes and stated he "hope[d] to shrink thyroid, otherwise [he] request[ed] surgery for compressive [symptoms]."  AR 529.  At the next appointment a month later Plaintiff had no complaints and denied compressive symptoms.  AR 530-31.  Dr. Sandler suspected Hashitoxicosis (Hashimotos Thyroiditis), and reported that Plaintiff had bipolar disorder in his medical history, but did not elaborate.  AR 632.

## 2.  Sfate Agency Physicians

### a)  *Dr. Gregory M. Nicholson, M.D.*

Dr. Nicholson was asked to perform a psychiatric consultative exam ("CE") in conjunction with the initial review of the Plaintiff's claim for benefits.  AR 49, 406. During the evaluation conducted on or about January 17, 2014, Dr. Nicholson observed Plaintiff "made good eye contact and good interpersonal contact" though his "mood was depressed."  AR 408.  Dr. Nicholson noted that Plaintiff's reported activities of daily living included grocery shopping with food stamps, cooking his own meals, handling bills, going out on his own and that he had his own vehicle for transportation.  AR 408. When asked why he stopped working assembling furniture, Plaintiff answered that it was because "I had mental illness." AR 408.

Plaintiff claimed "auditory hallucinations," where he heard voices "telling me how to live."  AR 407.  Dr. Nicholson noted that Plaintiff "endorse[d] a number of current symptoms related to bipolar disorder including mood swings, racing thoughts, depressed mood, insomnia, decreased appetite, decreased energy, trouble concentrating, and

---

[9] Though Dr. Sandler's and Dr. Aiken's offices are both located at the Mercy Medical Building (4060 Fourth Avenue, San Diego, CA 92103), adjacent to Scripps Mercy Hospital, they are located in different suites—Dr. Aiken's office is in suite 508, while Dr. Sandler's office is in suite 205. AR 629, 632. Thus, since the medical records do not indicate that the two doctors practice together, the Court will separate their treatment history of Plaintiff.

decreased interest in normal activities" and had been psychiatrically hospitalized a few times.  AR 407.

As for objective tests, Plaintiff could only recall one of three items after five minutes and a second with hints.  AR 409.  Dr. Nicholson was unable to examine Plaintiff's concentration and calculation because of the language barrier.  AR 409.  Though able to perform serial threes, Plaintiff was not asked to spell "world" forward and backward, nor asked how much change would be given if you paid for $0.20 in oranges with $1.00.  AR 409.

Dr. Nicholson found Plaintiff was "alert and oriented to time, place, person, and purpose"[10] and appeared to be of average intelligence.  AR 409.  Further, he found Plaintiff's thought process to be "coherent and organized," and that his "insight and judgment" and "fund of knowledge" grossly intact.  AR 408-09.

Based on his examination, Dr. Nicholson concluded that Plaintiff's functional assessment is "mildly limited," and that "from a psychiatric standpoint, the claimant's condition is expected to improve."  AR 410-11.  Dr. Nicholson determined Plaintiff "is able to understand, remember, and carry out simple one or two step job instructions," and is only mildly limited in his (1) "ability to relate and interact with co-workers," (2) "maintain concentration and attention, persistence and pace," (3) "accept instructions from supervisors," (4) "maintain regular attendance… and perform work activities on a consistent basis," and (5) "perform activities without special or additional supervision."  AR 410-11.

### b)  Dr. Subin and Dr. Paxton

At the initial level of review, State agency physicians, Drs. Subin and Paxton, reviewed Plaintiff's medical records and Dr. Nicholson's CE, and concluded that the Plaintiff's impairments were non-severe.  AR 46-63.  The doctors "considered the

---

[10] This is the equivalent to "Oriented x 4."  See discussion of the differences between "oriented x 3" and "oriented x 4," *supra* note 2.

3:17-cv-1406-MMA-NLS

medical records, [Plaintiff's] statements, and how [his] condition affects [his] ability to work." AR 54.

Dr. Paxton stated in his initial disability determination that Plaintiff's primary diagnosis was "All disorders of Thyroid (Except Malignant Neoplasm)," and his secondary diagnosis was "Affective (Mood) Disorder[;]" both diagnoses were labeled as non-severe. AR 43, 51. In explanation, Dr. Paxton determined that Plaintiff was depressed, but had no psychomotor agitations, which led to "none to mild limitations." AR 50. He noted Plaintiff had "mild limitations in ability to relate and interact with coworkers and public, in maintaining concentration and attention, in accepting instructions from supervisors and in performing work without special supervision" and rated Plaintiff's "Restriction of Activities of Daily Living" as mild. AR 50, 52.

Dr. Subin noted that Plaintiff's medically determinable impairments ("MDI") could not reasonably be expected to produce his pain or other symptoms because the MDI were non-severe. AR 52. Concluding that Plaintiff was not disabled, Dr. Paxton noted that "Impairment or combination of impairments does not significantly limit physical or mental ability to do basic work activities." AR 52-53.

### c) Martin Koretzky, Ph.D.

Dr. Koretzky reviewed Plaintiff's record on reconsideration. AR 66-95. In partial concurrence with the prior examiners, Dr. Koretzky noted that "Data in file document a mental impairment due to Mood disorder NOS that is severe but not of listing level." AR 73. He found Plaintiff's "statements have partial credibility. A mental impairment is established, but severity alleged is not fully supported by objective findings and ADL information." AR 73. However, Dr. Koretzky also found that Plaintiff's MDI could reasonably be expected to produce his pain or other symptoms, in contrast to Drs. Subin and Paxton. AR 75. He also noted that Plaintiff's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without and unreasonable number and length of rest periods" was "moderately limited." AR 76.

Finally, Dr. Koretzky notes that Dr. Gregory Nicholson's "opinion appears to underestimate limitations to some extent." AR 75. Dr. Koretzky stated Dr. Nicholson's findings "appears to rely on the assessment of limitations resulting from an impairment for which the source has not treated or examined the individual. The CE examiner's opinion is an underestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." AR 78.

## D. **Third Party Report from Chau Nguyen**

Chau Nguyen is Plaintiff's brother who submitted a "Function Report" for consideration to the Social Security Administration. AR 211. From approximately 2011 to 2015, Plaintiff lived in a "small quarters on a lot behind his young brother's house" (i.e., on Chau's premises). AR 479, 482. Chau stated Plaintiff "hears noises, voices" and has "blurred vision, tremor both hands, insomnia, eyes[,] thyroid." AR 211. He stated that Plaintiff does not take care of anyone else, such as a parent, child, or spouse. AR 212. Also, Plaintiff talks to himself and is often screaming, sometimes suddenly; "when asked why, he says someone did it not him doing it." AR 212, 217. He also stated that Plaintiff is not able to do any household chores, either indoors or outdoors. AR 213.

## E. **Hearing Testimony**

At the January 4, 2016 hearing, Plaintiff and Plaintiff's mother, Hoa Hyunh/Nguyen[11] testified, as well as Mary E. Jesko (an impartial vocational expert). AR 16, 99.

### 1. **Plaintiff**

Plaintiff testified that he smoked a pack of cigarettes every three days, understood some easy English words, and lived with his parents. AR 20-21. Plaintiff previously worked for Abbey Rents, delivering furniture. AR 22. He left that job after five or six

---

[11] In the administrative hearing, Plaintiff's mother was sworn as Hoa Huynh. AR 18 (plaintiff's counsel provides name and spelling). However, in the ALJ's decision, he refers to Plaintiff's mother as Hoa Nguyen. AR 99. For consistency, the Court will hereafter refer to her as "Hoa."

years, because of back pain (caused by the job) and because "I was not able to concentrate." AR 22. Next, Plaintiff worked as a manicurist for approximately six years. He testified he stopped working because "I was not able to concentrate." AR 23. Plaintiff explained he could not concentrate because he kept hearing voices; and that even though medication relaxes him, the voices did not stop. AR 24-25.

By Plaintiff's assessment, the most serious medical problem that would interfere with his ability to work was his thyroid condition. AR 25-26. He explained that his hyperthyroid impacted his vision, and when this thyroid "goes up" his vision goes blurry and could last a full day and can only read for five or ten minutes. AR 25-26, 29.

When asked if the Plaintiff believed the thyroid condition was a "bigger problem" than mental health issues, Plaintiff reiterated the mental issues affect his concentration, and thyroid affects vision. AR 26, 29. Plaintiff conceded that besides the thyroid and eye problems, he didn't have any other physical problems. AR 26.

Plaintiff also stated that on a typical day, he does housework such as cleaning, straightening up, and watching over his father. AR 26-27. In caring for his father, who had a stroke, Plaintiff testified that he "fe[d] him, assisted him to the bathroom, and walk[ed] him around." AR 29. Plaintiff also testified that he does not drive. AR 42.

### 2. Hoa

Hoa testified that Plaintiff lived with her because "he's sick, and no one [is] willing to take him." AR 30. According to Hoa, Plaintiff was well four or five years ago, and then, "[a]ll of a sudden, he's acting like this." AR 33. She noted that Plaintiff "seems not able to remember anything." AR 30.

As to mental issues, she testified that Plaintiff has screaming fits that are unpredictable and frequent, ranging from once a day to once a week, at all hours of the day and night. AR 31-33. She stated that Plaintiff does not drive, and, instead, wanders regularly and upon return, "he'll just say people ran over him" or "someone stabbed me."

AR 33-34.  Hoa indicated Plaintiff has been doing a "little bit better" since taking medication.[12]  AR 35-36.

Hoa contradicted Plaintiff's testimony regarding daily activities, saying he "doesn't do anything" around the house, except sweep the floors.  AR 32.  She testified that she did all the cooking and cared for Plaintiff's father, and had to care for Plaintiff as well.  AR 32-33.

### 3.  Mary E.  Jesko

Ms. Jesko testified that a manicurist is a sedentary, semi-skilled position, while a furniture mover/loader is a very heavy, semi-skilled position.  AR 38.  She concluded an individual of Plaintiff's age, education, prior work experience, and who was restricted to a "medium range of work" of routine, non-complex tasks in a nonpublic setting would not be able to perform as a manicurist or furniture mover/loader.  AR 38-39.  Instead, an individual in Plaintiff's position could work as a laundry worker, sweeper cleaner, or floor waxer.  AR 39.

However, Ms. Jesko testified that there would be no work available for a person in the Plaintiff's hypothetical position that was "off task more than 15 percent of the time due to psychologically based symptoms."  AR 40.  Ms. Jesko also conceded that if an individual in Plaintiff's position who was off task because he couldn't see clearly for more than 15% of the work day, he "would not be able to sustain competitive work."  AR 41.

## III.   ALJ DECISION

### A. <u>The Sequential Process</u>

To qualify for disability benefits under the Social Security Act, an applicant must show that he cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at

---

[12] As Hoa took her seat at the conclusion of her testimony, the ALJ asked Plaintiff if he took his mental health medications every day, to which Plaintiff responded affirmatively.  AR 38.

least 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).  The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a).  Applicants not disqualified at step five are eligible for disability benefits.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five."  *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009); *Celaya*, 332 F.3d at 1180.

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two.

At step two, the ALJ must determine whether the claimant has a severe medical impairment, or combination of impairments, that meets the duration requirement in the regulations.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant's impairment or combination of impairments is not severe, or does not meet the duration requirement, the claimant is not disabled.  If the impairment is severe, the analysis proceeds to step three.

At step three, the ALJ must determine whether the severity of the claimant's impairment or combination of impairments meets or medically equals the severity of an impairment listed in the Act's implementing regulations.[13]  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is disabled.  If not, the analysis proceeds to step four.

At step four, the ALJ must determine whether the claimant's residual functional capacity ("RFC")—that is, the most he can do despite his physical and mental limitations—is sufficient for the claimant to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ assesses the RFC based on all relevant evidence in the

---

[13] The relevant impairments are listed at 20 C.F.R. part 404, subpart P, appendix 1.

record. *Id;* § 416.945(a)(1), (a)(3). If the claimant can perform his past relevant work, he is not disabled. If not, the analysis proceeds to the fifth and final step.

At step five, the Commissioner bears the burden of proving that the claimant can perform other work that exists in significant numbers in the national economy, taking into account the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1560(c)(1), (c)(2); *see also* 20 C.F.R. § 404.1520(g)(1). The ALJ usually meets this burden through the testimony of a vocational expert, who assesses the employment potential of a hypothetical individual with all of the claimant's physical and mental limitations that are supported by the record. *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (citations omitted). If the claimant is able to perform other available work, he is not disabled. If the claimant cannot make an adjustment to other work, he is disabled. 20 C.F.R. § 404.1520(a)(4)(v).

## B. Substance of the ALJ's Decision

On October 26, 2017, the ALJ issued a written decision concluding that Plaintiff was not disabled within the meaning of the Act. AR 99-113. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2011, the alleged onset date of disability. AR 101. At step two, the ALJ found that Plaintiff had two severe impairments: hyperthyroidism and mood disorder. AR 101.

At step three, the ALJ determined that Plaintiff's impairments, alone and in combination, did not meet or medically equal the severity of the impairments listed in the regulations. AR 102. He stated that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." AR 102.

Further, the ALJ stated that, in order for mental impairments to be considered severe, they must result in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." AR 102. The ALJ concluded that Plaintiff has no restriction of activities of daily living, citing to Plaintiff's hearing testimony that

he cleans the house and takes care of his ailing father. AR 102. The ALJ concluded, relying on Dr. Nicholson's psychiatric consultative examination and Dr. Lessner's psychological assessment, that Plaintiff only has moderate difficulties (not the required marked difficulties) in social functioning. AR 102, 406-11, 478-89. Relying again on Dr. Nicholson's and Dr. Lessner's reports, the ALJ concluded that Plaintiff had only moderate difficulties with concentration, persistence, or pace. AR 102, 406-11, 478-89. The ALJ found no episodes of decompensation which have been of extended duration. AR 102. Thus, Plaintiff did not satisfy the severity requirement.[14]

At step four, the ALJ assessed that Plaintiff retained the residual functioning capacity to perform "a medium work as defined by 20 CFR 404.1567(c) and 416.967(c) except he may not work on dangerous machinery or at unprotected heights. [Plaintiff] may not climb ladders. He can perform routine, non-complex tasks in a non-public setting." AR 103. Ultimately, based on Plaintiff's RFC and the testimony of a vocational expert, who considered the impact of Plaintiff's limitations, the ALJ concluded that Plaintiff could not perform his past relevant work. AR 111.

In determining the above RFC, the ALJ considered objective medical evidence, medical opinions, and Plaintiff's testimony about his symptoms. AR 103-11. The ALJ applied the required two-step process to determine the credibility of Plaintiff's statements about his symptoms. AR 103. First, the ALJ concluded that Plaintiff's medical impairments (bipolar disorder, thyroid eye disease, and hyperthyroidism) could reasonably be expected to cause his alleged symptoms. AR 103-04. Second, the ALJ evaluated the intensity, persistence, and limiting effects of these symptoms to determine the extent to which they limit Plaintiff's functioning. AR 103-04. There, the ALJ provided a detailed explanation of his reasoning, using factors such as: daily activities;

---

[14] As to Plaintiff's mental impairments, the ALJ also considered "paragraph C" criteria, concluding that Plaintiff does not meet the severity requirement using that framework because there was no evidence of repeated episodes of decompensation. AR 103.

location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; type, dosage, effectiveness, and side-effects of medication taken; treatment received; and measures used to relieve symptoms. AR 104-11. The ALJ determined that Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the evidence for the reasons explained in this decision." AR 104.

In reaching this decision, the ALJ gave "little weight" to Hoa's hearing testimony and Chau Nguyen's third party adult function report. AR 104-05. Regarding physical restrictions, the ALJ accorded "significant weight" to the opinions of Dr. Tran and Dr. Marquardt. AR 110. Regarding Plaintiff's mental restrictions, the ALJ accorded "partial weight" to the state agency psychological consultant. AR 110. The ALJ gave no weight to the findings regarding Plaintiff's mental restrictions to Dr. Marquardt, Dr. Miller,, Dr. Nicholson, Drs. Subin and Paxton, and Dr. Henderson. AR 110-11. The ALJ also accorded "little weight" to Plaintiff's GAF score. AR 111.

Finally, at step five, the ALJ called upon a vocational expert to testify as to what jobs Plaintiff could perform given (i) his residual functioning capacity, age, education, and work experience, and (ii) the availability of suitable jobs in the national economy. AR 112. The vocational expert testified that an individual with Plaintiff's profile could perform certain unskilled, light-level occupations such as laundry worker, sweeper cleaner, or floor waxer. AR 112. Based on this testimony, the ALJ determined that Plaintiff was capable of adjusting to other work available in the national economy, and therefore found Plaintiff "not disabled" under the meaning of the Act. AR 112-13.

## IV.    ISSUES PRESENTED

Plaintiff challenges the ALJ's decision on the ground that, in assessing his residual functioning capacity, the ALJ failed to articulate legally sufficient reasons to (1) reject the opinions of Plaintiff's physicians concerning his physical impairments, (2) accord no weight to the opinions of Plaintiff's physicians concerning his mental impairments, and (3) conclude that Plaintiff's treatment history showed improvement in symptoms. ECF

No. 13-1 at 1-2. Plaintiff also challenges the ALJ's decision to deny benefits as a whole, claiming that it was not supported by substantial evidence. ECF No. 13-1 at 2.

Defendant contends the ALJ properly evaluated the medical opinion evidence regarding both physical impairments and mental impairments, reasonably rejected allegations of disability because evidence demonstrated that Plaintiff had greater abilities than alleged, and reasonably evaluated lay testimony. ECF No. 14. Defendant requests the court affirm the findings of the ALJ.

## V.    LEGAL STANDARD

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits in federal district court. 42 U.S.C. § 405(g). "As with other agency decisions, federal court review of social security determinations is limited." *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A federal court will uphold the Commissioner's disability determination "unless it contains legal error or is not supported by substantial evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citing *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006)). Substantial evidence means "more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007); *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 2003).

In reviewing whether the ALJ's decision is supported by substantial evidence, the Court must consider the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Lingenfelter*, 504 F.3d at 1035 (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The ALJ is responsible for "determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Garrison*, 759 F.3d at 1010 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

When the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190,

1193 (9th Cir. 2004); *see also Ryan v. Comm'r Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  When the evidence "can reasonably support either affirming or reversing a decision, [the Court] may not substitute [its] judgment for that of the [ALJ]"; rather, the Court only reviews "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  *Garrison*, 759 F.3d at 1010 (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).  Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are the exclusive functions of the agency.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  It is not the Court's job to reinterpret or re-evaluate the evidence, however much a re-evaluation may reasonably result in a favorable outcome for the plaintiff.  *Batson*, 359 F.3d at 1193.

## VI.  DISCUSSION

### A. The ALJ Properly Evaluated the Medical Opinion Evidence regarding Plaintiff's Physical Impairments

In making his determination regarding Plaintiff's physical impairments, the ALJ concluded that Plaintiff should be limited to "medium work with no climbing of ladders and no work with hazardous machinery or unprotected heights."  AR 110.  The ALJ gave "significant weight" to the opinions of Plaintiff's treating physicians, Dr. Tran and Dr. Marquardt, based on their findings of "easy fatigability and intermittent vision problems," while noting that hand tremors appeared under control with medication.  AR 110.

Plaintiff challenges this finding arguing the ALJ improperly acted as his own expert, and/or gave "controlling weight" to findings of lesser symptoms or predictions of improvement, and discrediting the more recent findings of Drs. Grisolia, Sandler, [15] and Henderson, that Plaintiff argues show continuing/worsening physical impairments

---

[15] Plaintiff's brief erroneously refers to Dr. "Sanders" (*see* ECF No. 13-1 at 20) and not, as reflected in the record, Dr. Sandler (*see* AR 529-32).

resulting from hyperthyroidism, specifically permanent blurry vision and hand tremors. ECF No. 13-1 at 14-15, 19-21.

Here, the ALJ gave controlling weight regarding the physical limitations created by Plaintiff's thyroid condition to the treating physicians that specialized and treated that condition, Drs. Marquardt and Tran. AR 110. In particular, the ALJ noted that Dr. Marquardt is Plaintiff's primary care physician, and that Dr. Tran was the doctor diagnosing hyperthyroidism and a hand tremor to the State of California. AR 105, 109. The ALJ properly rejected the conclusions of the State agency's reviewing consultant as inconsistent with the record. AR 105, 109.

As to any inconsistencies between the opinions of the treating physicians, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). A physician's opinion is not binding upon the ALJ and may be discounted where another physician contradicts it. *Magallanes*, 881 F.2d at 751. The more consistent a medical opinion is with the record as a whole, the more weight it is given. *See* 20 C.F.R. § 404.1527(d)(4). A treating source's opinion on the nature and severity of an impairment is given controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence of record. *See* 20 C.F.R. § 404.1527(d)(62). The "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Here, there is no indication that the ALJ rejected the opinions of Dr. Grisolia or Dr. Sandler in making his findings regarding Plaintiff's *physical* restrictions and according significant weight to Drs. Marquardt and Tran. Plaintiff presented to Dr. Grisolia, a neurologist, complaining of poor and double vision. AR 106. The ALJ notes Dr. Grisolia's exam "noted no significant physical findings." AR 106. Dr. Grisolia concluded that Plaintiff had permanent "low vision" and that "sustained use … will result in double vision." AR 429. Similarly, Dr. Sandler suspected Plaintiff suffers from Hashimoto's (and not Graves') disease, but his records reflect no physical symptoms

apart from eye fatigue and compressive symptoms, which Plaintiff denied having at his follow up visit. AR 529-32. These findings are accounted for and consistent with the ALJ's acknowledgment of "intermittent vision problems," and correlating work restrictions that avoid ladders, hazardous machinery, and unprotected heights. AR 110.

As to hand tremors, the ALJ was within his authority to resolve conflicts in the record. For instance, Dr. Henderson's conclusion that the hand tremor was "chronic" (AR 691) is contradicted by the medical record. As noted by the ALJ, the record shows "good control with medication early in the period." AR 110, 313. Plaintiff relies on Dr. Grisolia's opinions as recent and reliable regarding Plaintiff's vision, but disregards that Dr. Grisolia's records reflect that Plaintiff had no tremors during either appointment. AR 430, 491. The record as a whole presents conflicting evidence on how often tremors appear (*see* Section II.C) and what effect, if any, the tremors have on Plaintiff's daily life, particularly considering Plaintiff's testimony–confirmed by Hoa–that one of the chores he consistently performs is sweeping floors. *See* AR 32. Thus, the ALJ's conclusion that with respect to physical abilities Plaintiff should be limited to "medium work with no climbing of ladders and no work with hazardous machinery or unprotected heights" is consistent with the medical record as a whole. AR 110.

## B. The ALJ Improperly Evaluated the Objective Medical Evidence and Medical Opinion Evidence regarding Plaintiff's Mental Impairments

The ALJ found "the evidence supports severe mental impairment and functional restrictions allowing the claimant to perform routine, noncomplex tasks in a non-public setting." AR 110. In concluding that the Plaintiff's mental impairments were severe but not disabling, the ALJ gave partial weight to the opinion of the reviewing psychological consultant, Dr. Koretzky, and "little" or "no weight to any other opinions of record." AR 110.[16]

---

[16] There is an inconsistency in the ALJ's decision. He first indicates that he gives "no weight to the other opinions of record" (AR 110), and then, after providing reasons to reject some of the opinions,

Courts "distinguish among the opinions of three types of physicians: (1) those who
treat the claimant (treating physicians); (2) those who examine but do not treat the
claimant (examining physicians); and (3) those who neither examine nor treat the
claimant (non[-]examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.
1995). Courts "afford greater weight to a treating physician's opinion because he is
employed to cure and has a greater opportunity to know and observe the patient as an
individual." *Magallanes*, 881 F.2d at 751 (internal quotations omitted); *see e.g., Lester*,
81 F.3d at 830 (stating that "more weight should be given to the opinion of a treating
source than to the opinion of doctors who do not treat the claimant").

Where a treating physician's opinion is not contradicted by another doctor, the ALJ
can only reject the treating physician's opinion for "clear and convincing" reasons.
*Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017); *Lester*, 81 F.3d at 830. Where the
treating physician is contradicted by another doctor, the ALJ "must determine credibility
and resolve the conflict." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)
(internal quotation marks omitted). Since the treating physician's opinion is given
deference, to properly reject the opinion of a treating physician[17] in favor of a conflicting
opinion of an non-treating physician, an ALJ must take the extra step to make "findings
setting forth specific, legitimate reasons for doing so that are based on substantial
evidence in the record." *Thomas*, 278 F.3d at 957 (internal quotation marks omitted);
*Revels*, 874 F.3d at 654; *Lester*, 81 F.3d at 830-31. The ALJ can "meet this burden by
setting out a detailed and thorough summary of the facts and conflicting clinical
evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799

states "most opinions are accorded little weight" (AR 111). Because the ALJ gives the greatest weight
to the opinion of the non-treating, non-examining doctor, whether the treating doctors' opinions were
given "little weight" or "no weight" does not alter the requirement that specific, legitimate reasons be
provided.

[17] However, "[w]hen confronted with conflicting medical opinions, an ALJ need not accept a treating
physician's opinion that is conclusory and brief and unsupported by clinical findings." *Tonapetyan v.
Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

F.2d 1403, 1408 (9th Cir. 1986). If the non-treating physician "relies on independent clinical findings that differ from the findings of the treating physician," to the extent that the non-treating physician's "opinion rests on objective clinical tests, it must be viewed as substantial evidence." *Magallanes*, 881 F.2d at751 (9th Cir. 1989) (internal quotations omitted).

Here, there is evidence in the record of contradictory opinions among Plaintiff's treating, examining, and non-examining physicians regarding the severity of the limitations caused by Plaintiff's mental impairments.[18] In light of the contradictions, the Court will use the "specific, legitimate reasons" standard. *See Thomas*, 278 F.3d at 957.

The ALJ fails to meet this standard. First, the ALJ fails to provide any reason to reject the opinions of at least three treating physicians: Drs. Karp, Carlton, and Lessner. Second, while the ALJ does provide some reasons to discount or reject a few of the treating physicians' opinions, the reasons for rejecting the opinions of Drs. Marquardt and Henderson do not rise to the level of "specific and legitimate." Finally, the ALJ fails

---

[18] For example, and as set forth above in section II.C: Dr. Koretzky (a non-examining physician) labeled Plaintiff's mood disorder as severe, but concluded that it did not rise to the requisite severity level needed for benefits; he also concluded that Plaintiff's ability to complete a normal workday was moderately limited. AR 74-76. Dr. Nicholson (an examining physician) assessed that Plaintiff's mental impairments were expected to improve, concluding that Plaintiff was only mildly limited and could maintain work attendance, maintain concentration, and perform work activities. AR 410-11. Dr. Paxton and Dr. Subin (non-examining physicians) determined that Plaintiff was non-severely depressed, causing at most mild limitations. AR 43, 50-51. In contrast, Dr. Marquardt (a treating physician) concluded that Plaintiff had severe psychotic and bipolar mental impairments, which disrupted his life. AR 329, 391. Dr. Henderson (a treating physician) concluded that Plaintiff had severe mental illness, which significantly restricted his ability to maintain a job. AR 664-65. Dr. Miller (an examining physician) concluded that it was unlikely that Plaintiff would be able to return to even a sedentary job, because of his mental impairments, anxiety, concentration problems, and cognitive deficits. AR 421-25. Dr. Lessner (an examining physician) concluded that Plaintiff had major depression with psychotic features, generalized anxiety disorder, post-traumatic stress disorder, and schizoid personality disorder; and noted that the prognosis of Plaintiff's mental impairments and psychotic condition seemed futile. AR 487-83. Dr. Carlton (an examining physician), who met with Plaintiff numerous times, consistently reported Plaintiff's psychosis, paranoia, and auditory hallucinations, but sought more corroborative evidence from his family. AR 379-80, 383-86. Dr. Karp (an examining physician), noted Plaintiff's paranoid ideations, variable affect, impaired cognitive functioning, and assessed a 47 GAF, but stated that Plaintiff denied auditory hallucinations and lived independently. AR 107, 376.

to provide adequate reason to value the opinion of the non-treating, non-examining, Dr. Koretzky over the opinions of all the treating physicians.

### 1. *Dr. Lessner*

The ALJ erred by failing to provide any reasoning to discount or reject the opinions of Dr. Lessner.[19]  An ALJ must give a reviewing court the basis and amount of weight accorded—the Court is not to guess.  *See Garrison*, 759 F.3d at 1012-13 (concluding that "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."); *Van Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (concluding that "the ALJ erred because he neither explicitly rejected the opinion of [the examining physician], nor set forth specific legitimate reasons for crediting [the non-examining physician] over [the examining physician]").

Here, the ALJ includes a summary of Dr. Lessner's findings, but offers no specific, legitimate reason to reject his findings or opinions.  *See* AR 109-10.  To the extent the ALJ had any criticism of Dr. Lessner's findings, the ALJ noted an inconsistency within Dr. Lessner's report regarding Plaintiff's self-reported statements that he took care of both of his parents and the psychological testing results.  AR 109.  Such an inconsistency fails to qualify as a specific and legitimate reason to reject Dr. Lessner's opinion, particularly because part of Dr. Lessner's psychological testing results included that Plaintiffs suffers from memory deficits and delusional behavior.  Even assuming this inconsistency were a reason to discount Dr. Lessner's opinion, an ALJ "not[ing] that [the physician]'s conclusions were based on 'limited observation' of the claimant[,] ... would be a reason to give less weight to [an] opinion than to the opinion of a treating physician,

---

[19] The ALJ also did not address the opinions of Drs. Karp and Carlton, both of whom were treating physicians.  However, because Drs. Karp and Carlton did not opine on Plaintiff's ability to work, it is not clear that the ALJ rejected their opinions.

it is not a reason to give preference to the opinion of a doctor who has *never* examined the claimant." *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (emphasis in original).

The ALJ's failure to address Dr. Lessner is particularly problematic because Dr. Lessner's records are among the few that contain medical tests aimed at deciphering the extent of mental health impairments, including the Mooney Problem Check List, Rotter Income Sentence Blank, Bender Gestalt Test, Beck Depression Inventory, and Minnesota Multiphasic Personality Inventory-2. AR 108-09, 483. *See* Section II.C.1.(i). The testing suggested depression, emotional instability, possible brain damage, psychosis, paranoid ideations, delusions, and inability to handle stress, and Dr. Lessner concluded that Plaintiff would not be able to work. AR 483, 485-89; *see also* Section II.C.1.(i). The ALJ's failure to offer specific, legitimate reasons to discount or reject Dr. Lessner's testimony was error.

### 2. *Rejection of the Opinions of Drs. Marquardt and Henderson*

In his decision, the ALJ provides some reasoning for rejecting the opinions of Dr. Henderson, Dr. Marquardt, Dr. Nicholson, Dr. Miller, and Drs. Paxton and Subin. AR 110-11. The reasons provided to reject or discount the opinions of Dr. Nicholson,[20] Dr. Miller,[21] and Drs. Paxton and Subin[22] are sufficiently specific and legitimate based on those doctors relatively limited contact with Plaintiff to pass muster. However, the ALJ rejected the opinion of Dr. Marquardt, Plaintiff's primary care physician, and Dr.

---

[20] The ALJ accorded no weight to Dr. Nicholson's opinion because of the inconsistency between Plaintiff's GAF assessment (50, indicating severe impairments) and his conclusion that Plaintiff was only mildly limited. AR 110; AR 406-11. The ALJ later states that he accorded little weight to any physician's GAF score, due to it being only a snapshot opinion about the Plaintiff's level of functioning. AR 111.

[21] The ALJ accorded no weight to Dr. Miller's opinion because he only examined Plaintiff once, the notes contain discrepancies regarding memory deficits, and Dr. Miller relied on research material from Wikipedia "rather than objective findings" rendering his opinion unreliable. AR 111. *But see Lester*, 81 F.3d at 832 (conclusions based on limited observation entitled to less weight, but does not "give preference to the opinion of a doctor who has *never* examined the claimant." (emphasis in original)).

[22] The ALJ accorded no weight to the initial state level psychological consultants, Dr. Paxton and Dr. Subin, because their opinion was not a fair representation of the evidence received at the subsequent hearing. AR 111.

Henderson, who treated Plaintiff for nearly two years, without providing adequate reasoning.

The ALJ rejected the opinion of Dr. Marquardt regarding Plaintiff's mental impairments because she based her assessments on e-consults and Plaintiff's subjective statements instead of objective criteria;[23] and because, mental health is not her area of expertise. AR 110. The ALJ rejected the opinion of Dr. Henderson as unreliable because it was "unsupported by any clinical notations" and appears to "accept uncritically as true" the subjective statements of Plaintiff and his family members. AR 111.

Dr. Marquardt was Plaintiff's primary care physician over a span of several years. "It is well established that primary care physicians (those in family or general practice) identify and treat the majority of Americans' psychiatric disorders" even when they have not completed residency training programs in psychiatry. *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). Thus, "the treating physician's opinion as to the combined impact of the claimant's limitations—both physical and mental—is entitled to special weight." *Lester*, 81 F.3d at 833. Similarly, use and reliance on eConsults is not disqualifying because courts have found that an "integral part of the treating physician's role is to take into account all the available information regarding all of his patient's impairments—including the findings and opinions of other experts." *Id*. Thus, that mental health was not Dr. Marquardt's expertise and her use of e-consults and are not valid reasons for the ALJ to reject her opinion.

The ALJ also pointed to the reliance on the subjective statements of Plaintiff as a reason to reject both Dr. Marquart's and Dr. Henderson's opinions. AR 110-11. The regulations find that objective medical evidence includes "psychological abnormalities that can be observed, apart from your statements (symptoms). ... Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities,

---

[23] This is notably inconsistent with the ALJ's rejection of Dr. Lessner's opinion which relied on objective test results.

e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated." 20 CFR § 404.1502(g). Treating physicians often and understandably use patients' subjective reporting of symptoms to make diagnoses. *See e.g., Belanger v. Berryhill*, 685 Fed. App'x 596, 598 (9th Cir. 2017); *Reddick*, 157 F.3d at 725-26. Dr. Marquardt and Dr. Henderson's "diagnosis was quite likely based, in part, on [their] observation of Plaintiff during [their] examination and not purely on Plaintiff's subjective history, as the ALJ suggests." *Popick v. Comm'r Soc. Sec.*, 32 F. Supp. 3d 157, 168 (N.D.N.Y. 2012). The record suggests that Dr. Marquardt and Dr. Henderson formed their opinions about Plaintiff's diagnosis "based upon observed abnormalities of behavior, rather than any subjective statement by Plaintiff." *Id*. This is particularly so for Dr. Marquardt, whose notes indicate she was often skeptical of Plaintiff's self-reported symptoms (*i.e.,* "not clear if [side effects] are real or patient's way of not taking [meds]" AR 389), and noted his "odd affect." Moreover, these notes and observations are consistent with the record as a whole, with many doctors noting inappropriate responses, strange smiles, and an odd affect from Plaintiff. *See* Section II.C. Likewise, Dr. Henderson's reports make clear he did not accept Plaintiff's subjective statements, instead finding the family's version of events credible. AR 690, 692. This is consistent with the record and the family's statements and testimony to the ALJ. *See* Sections II.D and II.E.2.

The Court finds that as to Dr. Marquardt and Dr. Henderson, the ALJ did not adequately detail his reasoning in accordance with the "specific and legitimate" standard, and did not weigh "factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." *Revels*, 874 F.3d at 654 (citing 20 CFR § 404.1527(c)(2)-(6)). In order to reject those opinions, the ALJ must provide a more thorough analysis.

///

### 3. *Acceptance of Dr. Koretzky's Opinion*

Dr. Koretzky did not meet, treat, or examine Plaintiff. AR 81-94, 110. Thus, the Court considers him a non-examining physician. Dr. Koretzky's opinion does not rest on objective clinical tests, and therefore his opinion is not considered substantial evidence. *Magallanes*, 881 F.2d at 751.

The "opinion of a non[-]examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Revels*, 874 F.3d at 655 (internal quotation omitted). But, it is not impossible to give more weight to a non-examining physician over a treating physician: "When it is an examining physician's opinion that the ALJ has rejected in reliance on the testimony of a non[-]examining advisor, reports of the non[-]examining advisor need not be discounted and may serve as substantial evidence *when they are supported by other evidence in the record and are consistent with it*." *Andrews*, 53 F.3d at 1041 (emphasis added). In rejecting the opinions of treating physicians, the ALJ "must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

Thus, to properly accept Dr. Koretzky's opinion over those of the treating physicians, the ALJ must demonstrate that Dr. Koretzky's opinion is supported by the evidence in the record, consistent with the record as a whole, and provide an explanation as to why Dr. Koretzky's opinion is preferable. The ALJ fails to meet these criteria.

Every treating physician examining the Plaintiff concluded that his mental impairments were severe and disabling: Drs. Marquardt, Henderson, Miller and Lessner.[24] Only the State agency physicians concluded that despite severe mental impairments, Plaintiff could maintain work attendance, appropriate concentration, and functional activities. Despite the concurrence of the treating physicians, the ALJ accepts

---

[24] While Drs. Karp and Carlton examined Plaintiff and found his condition severe, they did not opine on his ability to work.

only the opinion of the non-examining physician.  *See* 20 C.F.R. § 404.1527(d)(4) (considering that the more consistent a medical opinion is with the record as a whole, the more weight it is given).  In doing so, the ALJ improperly accepted Dr. Koretzky's opinion without providing sufficient reasoning to reject the opinions of the treating physicians.  *See Embrey*, 849 F.2d at 422 ("Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's, it is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings.").

Here, the only explanation for the ALJ's conclusion despite "severe mental impairment and functional restrictions" that Plaintiff can "perform routine, non-complex tasks in a non-public setting" is that "[t]hese limitations address the claimant's reported symptoms and findings from multiple mental status exams and psychological testing." AR 111.  This determination fails to provide sufficient explanation and is self-contradictory as the ALJ purports to rely on the testing and exams performed by the treating physicians while rejecting their conclusions.  On remand, the ALJ must provide additional information and reasoning to reject or discount the opinions of the treating physicians and offer an explanation as to why his conclusion is correct.

### C. The ALJ Did Not Make Clear the Basis for Credibility Determinations

In his hearing testimony, Plaintiff testified that he spends his days cleaning, straightening up the house, and watching over his ill father.  AR 27.  Based on this testimony, the ALJ discredited Plaintiff's allegations of disabling symptoms and limitations as inconsistent with his daily activities.  AR 102.  In finding the Plaintiff's hearing testimony credible, he accorded little weight to Chau and Hoa's statements regarding Plaintiff's functional limitations because of their "inherent bias/subjectivity, lack of medically acceptable standards," and inconsistencies both with objective medical evidence and Plaintiff's own testimony.  AR 105; ECF No. 13-1 at 24.

///

Daily activities may be grounds for an adverse credibility finding if the claimant is able to perform substantial physical functions that could be transferred to the workplace. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).  In accepting or rejecting a plaintiff's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834.  "The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).

"Although eyewitnesses have to rely to some extent on communications with the claimant in ascertaining whether [he] is disabled or malingering, we have held that friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his] condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  Disregarding this evidence "violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Id*. at 919 (internal quotation omitted).  "If the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness." *Id*.

It is the ALJ's responsibility to determine credibility, and resolve ambiguities and inconsistencies in the medical evidence.  *Garrison*, 759 F.3d at 1010; *Tommasetti*, 533 F.3d at 1041; *see e.g., Thomas*, 278 F.3d at 959 (discrediting testimony due to inconsistent statements).  "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Thomas*, 278 F.3d at 959.

Here, the record is replete with inconsistent accounts of the Plaintiff's abilities and day-to-day activities:  Plaintiff reported to Dr. Lessner that he "devotes most of his days looking after his parents." AR 481.  Dr. Nicholson noted that Plaintiff's activities of daily living included grocery shopping with food stamps, cooking his own meals, handling bills, going out on his own and that he had his own vehicle for transportation.

AR 408.  Conversely, in Plaintiff's own disability report, he stated "I have anxiety, I cannot see wwell [sic] and my hands are shaking so I cannot cook or do any household chores." AR 285.  His mother, Hoa, testified in the hearing that Plaintiff does nothing around the house, except sweeping the floors occasionally, leaving his mother as the caretaker of both Plaintiff and his father.  AR 32-33.  Plaintiff's brother, Chau, stated in his third party function report that Plaintiff is unable to do any household chores, either indoors or outdoors.  AR 213.  Dr. Miller found that Plaintiff "is limited to simple chores" because "he cannot make generalizations, evaluations or decisions on any new areas with or without immediate supervision[.]"  AR 425.  Dr. Henderson indicated that Plaintiff's "day-to-day activities consist of very little.  He does not cook or shop.  He does not drive.  ...  and does not do any of the household activities such as cleaning, laundry or dishes." AR 692.  Dr. Henderson reported in March 2016 that Plaintiff "is in severe delusion thinking that he is caring for his ill father but actually he is a burden to the family who has been supervising him."  AR 690.  Finally, multiple practitioners expressly noted that Plaintiff was poor historian of his own conditions:  Dr. Karp found it "difficult to ascertain [symptoms] as [patient] is poor historian – need to have family input," AR 378; Dr. Carlton notes that Plaintiff needed to bring a family member with him to the next appointment, "as [she] need[ed] corroborative evidence" and because he was a "poor historian," AR 379-80, 383-86.

　　　　With strongly conflicting accounts of the Plaintiff's abilities, it is the province of the ALJ to resolve ambiguities.  However, "'in evaluating a claimant's subjective complaints of pain [or other symptoms], the adjudicator must *give full consideration to all of the available evidence*, medical and other, that reflects on the impairment and any attendant limitations of function.'  Such other evidence includes the claimant's prior work record, her daily activities, and observations by treating and examining physicians and third parties about the claimant's symptoms and their effects." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (quoting SSR 88-13, emphasis added).

The ALJ's credibility determination favoring Plaintiff's hearing testimony as accurate is, to some extent, inconsistent with his own findings that Plaintiff suffered from "severe mental impairments." AR 110. And while it is not the Court's place to second guess credibility determinations where they are supported by substantial evidence in the record, here there is at least as much contradiction of Plaintiff's account as there is support. Likewise, even though Plaintiff's mother and brother may have been biased, the ALJ cannot use characteristics common to all family members as a means to reject testimony. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (concluding that the ALJ ran afoul of Ninth Circuit precedent by relying on characteristics common to all spouses, such as being an interested party and not seeing the claimant at work). Finally, because the ALJ gave no or little weight to the opinions of the treating physicians, it is not clear the ALJ gave "full consideration of all available evidence" when deciding to credit Plaintiff's testimony.

On remand, the ALJ should make clear that his credibility determination as to Plaintiff gave consideration to "all available evidence" and is "supported by substantial evidence" in the record. *Tommasetti*, 533 F.3d at 1039; *Smolen*, 80 F.3d at 1285. Likewise, the ALJ must provide "reasons that are germane" to each witness to discount the testimony of Chau and Hoa. *Dodrill,* 12 F.3d at 919.

## VII. RECOMMENDATION

The Court finds that the ALJ's denial of benefits regarding Plaintiff's physical impairments was supported by substantial evidence. The Court also finds that the ALJ did not consider the entire record nor did he provide "specific and legitimate reasons supported by substantial evidence" in his decision to reject the medical opinions and objective medical evidence of Plaintiff's mental impairments. *See Garrison*, 759 F.3d at 1012 (quoting *Ryan*, 528 F.3d at 1198). Accordingly, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED IN PART** and that Defendant's cross motion for summary judgment be **DENIED**.

A determination whether to reverse and award benefits or reverse and remand for further administrative proceedings is within the Court's discretion. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). The Court therefore finds that remand is appropriate because "[t]here may be evidence in the record to which the [ALJ] can point to provide the requisite" reasons for rejecting the aforementioned opinions. *McAllister*, 888 F.2d at 603 (remanding so that the ALJ could review the record and either provide legally sufficient reasons for rejecting the treating physician's report or award benefits, since the ALJ "is in a better position than this court to perform this task."). Accordingly, the Court **RECOMMENDS** that the ALJ's decision as to Plaintiff's mental health impairments be **REMANDED** for further administrative proceedings consistent with this opinion. *See* 42 U.S.C. § 405(g). On remand, the ALJ should provide due consideration to opinions of treating and examining physicians in light of "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." *Revels*, 874 F.3d at 654 (citing 20 CFR § 404.1527(c)(2)-(6)). And, if the ALJ rejects these opinions, he must provide "specific and legitimate" reasons for doing so. Likewise, the ALJ must clarify and provide additional support for credibility determinations to resolve inconsistencies identified by the Court.

///

///

///

///

///

///

///

///

## VIII. CONCLUSION

This Report and Recommendation is submitted to the United States district judge pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties by August 17, 2018. The document should be captioned "Objections to Report and Recommendation." Any response to the objections shall be filed and served by August 24, 2018. The parties are advised that any failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991).

Dated: [8/3/2018]

Hon. Nita L. Stormes
United States Magistrate Judge